**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **(1)  BABY BOY D.S.,  by and through** | ) | |
| **Alexis Stokes and Taylor Stokes, his** | ) | |
| **guardians and next friends;** | ) | |
| **(2) ALEXIS STOKES, individually, and** | ) | |
| **(3) TAYLOR STOKES,  individually** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | |
| | ) | **Case No: 17-CV-186-KEW** |
| **(1)  UNITED STATES OF AMERICA** | ) | |
| **ex rel.  The Indian Health Service,  &** | ) | |
| **Chickasaw Nation Medical Center,** | ) | |
| **An Agency of the Chickasaw Nation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**COMPLAINT**</u>
(Redacted per Court's Minute Order entered on 5/19/17)

Plaintiffs allege and state the following:

**JURISDICTION AND VENUE**

1.      The Plaintiffs in this action are Baby Boy D.S. and his parents, Alexis and Taylor Stokes.

2.      Taylor Stokes and Alexis Stokes are the next friends and natural guardians of Baby Boy D.S., as well as his Court appointed guardians.  Each Plaintiff is a resident of the State of Oklahoma living in this judicial district where the acts giving rise to this Complaint occurred.

3.      This is a claim arising out of medical negligence at the Chickasaw Nation Medical Center.

4.       Pursuant to 25 U.S.C. § 450f *et seq*, now 25 U.S.C. §5321 *et seq,* and 28 U.S.C. §2671 *et seq* (FTCA) The United States of America is the Defendant in its capacity as the legally responsible entity for actions and omissions of:

1

    a.   The Department of Health and Human Services, and its agency,

    b.   The Indian Health Service (IHS), and

    c.   The Indian Health Services' contract service unit, namely, the Chickasaw Nation Medical Center (CNMC), located in Ada, Oklahoma, and

    d.   The agents and employees of the CNMC, among whom are various individual nurses and doctors.

5.    This Court has jurisdiction of this matter pursuant to 28 U.S.C. §2671, *et seq.*, and pursuant to supplemental jurisdiction conferred upon this Court pursuant to 28 U.S.C. §1367 (a).

6.    The events about which Plaintiffs complain took place at the Chickasaw Nation Medical Center in Ada, Pontotoc County, Oklahoma, in the Eastern District of the United States District Court.

7.    The Chickasaw Nation Medical Center is under the direct control of the Chickasaw Nation Department of Health and, therefore, under the control of the Chickasaw Nation and its Governor.

8.    Dr. Judy Goforth Parker, R.N., PhD, was the Secretary of the Chickasaw Nation Department of Health at the time of the birth of Baby Boy D.S. and continues in that position at the time this Complaint is filed.

9.    Plaintiffs have, pursuant to the administrative procedures associated with the Federal Tort Claims Act (FTCA), filed substantive claims with the United States of America, setting forth the basis of the claims and injuries. The six month time to respond to said claims expired on or about April 21, 2017, without the United States taking action on said claims, and those claims are now, by operation of law, deemed to be denied.  Those original claims have been amended, but only with respect to the amount of the claims.

10.     Plaintiffs are advised that the bureaucratic administrative review process is overwhelmed with claims and, for that reason, Plaintiffs have concluded that it is unlikely that their claims would be reviewed on their merits at any reasonable future time.  Given that uncertainty, the exhaustion of the administrative remedies, and the urgent needs of the Plaintiffs for relief to assist them in caring for their infant child, Plaintiffs now commence this action.

11.     As required by 12 O.S. § 19.1, Plaintiffs' counsel has consulted and reviewed the facts of their claims with qualified experts and obtained a written opinion from an expert that includes the determination, based on review of the available material, that a reasonable interpretation of the facts supports a finding that the acts or omissions of the Defendant constituted negligence.

12.     Pursuant to local court rule, LCvR 3.1, counsel is required to advise the Court on the face of the Complaint if ". . . this action is related to any previously filed case in this Court…" Accordingly, counsel advises the Court that at least the following three cases are known to the undersigned counsel to be "related" to the present matter:

> 6:99-cv-00701-FHS Tipton et al v USA et al
> 6:00-cv-00404-KEW Angela Kile et al v Chickasaw Nat Health, USA et al.
> 6:02-cv-00507-JHP   Harkins, et al v. Jenkins, USA

Each of those three cases involved the same Defendant (The United States of America) and arose out of the same series of Indian Health Service hospital contracts with the Chickasaw Nation. Further, each of those cases were, on information and belief, cases that had most, or all, of the following factors that are common (and therefore "related") with the factual matters set forth in the present Complaint:

A) A common failure of the contract Indian hospital to provide competent nurses and/or doctors and to properly manage labor, delivery, and resuscitation of babies;

B) A common failure to adopt and/or enforce policies and procedures consistent with the then national standard of care for labor, delivery, & resuscitation of babies;

C) A common failure at the institutional management and staff levels to establish, maintain, and enforce a culture of safety among the employees and management at CNMC, an Indian Health Service contract hospital; and,

D) A common result, outcome, or injury, that being the profound hypoxic-ischemic encephalopathy (HIE) of newborn babies resulting, in each case, in life long spastic quadriplegia (cerebral palsy) for each of the multiple victims of the medical malpractice at that Indian Health Service contract hospital facility.

**FACTS COMMON TO ALL CLAIMS FOR RELIEF**

13.     The Indian Health Manual published by the Indian Health Service states:

> **"The IHS will provide the highest possible technical level of obstetric care to AI/AN [American Indian / Alaskan Native] mothers as determined by accepted national standards." IHS Indian Health Manual.**

**14.**     The IHS Senior Clinicians for Obstetrics/Gynecology and Pediatrics And the Chief, Nurse Midwifery, and the IHS Maternal and Child Health (MCH) Coordinator are responsible for monitoring compliance with the policy stated in the previous paragraph.

**15.**     The Area MCH consultant for the IHS provides technical assistance and consultation to service units in evaluating their obstetric services and implementing procedures to comply with [the policy stated in the Indian Health Manual, and quoted, above].  The Area MCH consultant is obligated to monitor service unit compliance with this policy and recommend corrective actions to the Service Unit Director and Area Director when necessary.

16.     The CNMC Service Unit Director, Clinical Director and the Director of Nurses, are responsible for the evaluation of the maternal and obstetric training needs of the service unit professional staff and for implementation of an appropriate program of in-service and out-of-

service maternal and obstetric training designed to ensure the highest level of professional obstetric and maternal care possible.

17.     The Chickasaw Nation and/or the CNMC is an entity that contracts with the Department of Health and Human Services and its Indian Health Service to operate the Indian hospital facility located in or near Ada, Oklahoma.

18.     Since 1991, there have been a series of perinatal hypoxic ischemic "Sentinel Events" involving profound brain damage that have occurred at the IHS/Chickasaw Nation Medical Center in Ada, Oklahoma (or its immediate predecessor, the Carl Albert Indian Hospital, also in Ada, Oklahoma).

19.     That series of perinatal hypoxic ischemic "Sentinel Events" referred to in the previous paragraph are documented in the records of the United States District Court for the Eastern District of Oklahoma and in the records of the Department of Justice.

20.     The victims of this series of Sentinel Events at the CNMC include at least the following children known, personally, to counsel for the Plaintiffs in this matter:

1. Worcester;
2. Tipton;
3. Harkins;
4. Lemmings;
      and now,
5. Baby Boy D.S.

21.     Each of the first four Sentinel Events resulted in substantial multi-million dollar settlements and payments by the taxpayers of the United States of America to the children and their parents.

22.     Each one of this series of tragic perinatal brain injury Sentinel Events has an underlying common root cause which is the failure of the CNMC to implement policies and procedures to

assure routine compliance with the national standard of obstetric care by well qualified nurses, nurse midwives, and doctors working at the CNMC and its predecessor facility.

23.     The IHS Senior Clinicians for Obstetrics/Gynecology and Pediatrics and the Chief, Nurse Midwifery, and the IHS Maternal and Child Health (MCH) Coordinator have failed to monitor the compliance by the CNMC with the standards of care stated in the Indian Health Service Indian Health Manual.

24.     The failure of the IHS Senior Clinicians for Obstetrics/Gynecology and Pediatrics and the Chief, Nurse Midwifery, and the IHS Maternal and Child Health (MCH) Coordinator to monitor the compliance by the CNMC with the standards of care stated in the Indian Health Service Indian Health Manual was a cause of the Sentinel Event associated with the birth of Baby Boy D.S. and his lifetime injuries.

25.     The IHS Area Maternal and Child Health (MCH) Coordinator failed to monitor the compliance by the CNMC with the standards of care stated in the Indian Health Service Indian Health Manual.

26.     The failure of the IHS Maternal and Child Health (MCH) Coordinator to monitor the compliance by the CNMC with the standards of care stated in the Indian Health Service Indian Health Manual was a cause of the Sentinel Event associated with the birth of Baby Boy D.S. and his lifetime injuries.

27.     The Governor of the Chickasaw Nation has caused a magnificent state-of-the-art hospital facility to be constructed in Ada, Oklahoma as a successor to the Carl Albert Indian Hospital. This new facility is known as the Chickasaw Nation Medical Center (CNMC).   The CNMC hospital became operational in 2010.

28.     The management of the Indian Health Service and the management of the CNMC has

failed to create and maintain a culture of safety with respect to perinatal obstetric care at CNMC.

29.     One of the common definitions of insanity involves human beings and their organizations continuing to wrongly do certain high risk activities in the same way, over and over again, all while continuing to expect a different outcome.

30.     Five avoidable perinatal Sentinel Events of the same general nature, and due to the same general basic root cause, are at least four Sentinel Events too many.

31.     At the Indian Hospital Facilities located in Ada, Oklahoma, there has been a quarter-century-long history of continuing departures from the minimum level of the national standard of care afforded to patients.

32.     This tragic history is a result of the ongoing failure of managers and administrators of the Chickasaw Nation Medical Center, and its predecessor (The Carl Albert Indian Hospital), to put into place, and require compliance with, policies, procedures, protocols, testing, and certifications designed to ensure that the national standards of care for labor and delivery are adopted, followed, and complied with by the nursing and medical staff.

33.     By mandate of the Indian Health Service, the Chickasaw Nation Medical Center is legally obligated to adopt and implement policies and procedures that are consistent with the current national standard of care for labor and delivery as described by the American College of Obstetricians and Gynecologists (ACOG).

34.     The mandate described in the previous paragraph is implemented through the Indian Health Manual, issued by the Indian Health Service, a division of the Department of Health and Human Services, which states:

> "*The IHS will provide the <u>highest possible technical level obstetric care</u> to AI/AN mothers as determined by accepted national standards.* In so doing, IHS policy, procedures, and standards will be brought into line with current

> American College of Obstetricians and Gynecologists (ACOG) and Joint Commission on Accreditation of Healthcare Organizations (JCAHO) recommendations and standards with respect to emergency cesarean delivery."
> Indian Health Manual Part 3, Chapter 13:  Manual Appendix 3-13-A.

35.     At the time of the birth of Baby Boy D.S., the CNMC had failed to adopt policies, procedures, and standards that complied with the Indian Health Service mandate quoted in the previous paragraph.

36.     The CNMC has failed, for a decade or more, to adopt policies, procedures, training, and critical standardized terminology that are consistent with the national standard of care for labor and delivery as publicly described by the American College of Obstetricians and Gynecologists.

37.     The policies and procedures related to labor and delivery that were in place in May of 2016 at the CNMC did not comply with the national policies and procedures as described by the American College of Obstetricians and Gynecologists

38.     The Chickasaw Nation Medical Center has materially failed to comply with the legal requirements of the Indian Health Service with respect to the CNMC's provisions for the "highest possible level" of obstetric patient care.

39.     For the reasons stated above, the Chickasaw Nation and its CNMC are in breach of the service unit contract with the Indian Health Service and, therefore, the United States of America.

40.     The antiquated policies, procedures, and terminology related to labor and delivery in place at the Chickasaw Nation Medical Center in May of 2016, were inadequate and inferior and less safe for patients as compared to the national standard of care for labor and delivery that prevailed in May of 2016 and for a number of years prior to that time.

41.     On information and belief, those policies, procedures, and terminology are still in place at the CNMC, nearly one year after the birth of Baby Boy D.S.

42.     The Indian Health Service requires service units, such as the CNMC, to review and update the service unit's policies and procedures on at least an annual basis.

43.     Descriptions of perinatal standards of care that meet the national standard of care for labor and delivery as articulated by the American College of Obstetricians and Gynecologists have been widely published in multiple reputable medical and nursing journals for a number of years prior to the birth of Baby Boy D.S.

44.     CNMC hospital administrators and staff were aware or did not care, that their repeated failures to adopt, implement, and enforce compliance with published national standards of obstetric care for labor and delivery at the CNMC created a substantial and unnecessary risk of serious harm to the pregnant mothers and their babies who sought medical care at the CNMC.

45.     The national standard of care for credentialing doctors and surgeons at accredited hospitals typically requires that each doctor, surgeon, obstetrician, and pediatrician be board certified by one of the boards recognized by the American Board of Medical Specialties, or else such doctor must at least be eligible to take the required test(s) to become board certified.

46.     Multiple members of the CNMC medical and surgery staff are not board certified.

47.     Any failure by the CNMC's management to require adequate qualification, training, and certification of its labor and delivery *medical staff*, is institutional negligence on the part of the CNMC.

48.     Any failure by the CNMC's management to require adequate qualification, training, and certification of its labor and delivery *nursing staff*, is institutional negligence on the part of the CNMC.

49.     Any failure by the CNMC's management to require adequate qualification, training, and certification of its *pediatric medical staff*, is institutional negligence on the part of the CNMC.

50.     The CNMC negligently credentialed nurses and doctors associated with the care of Alexis Stokes and Baby Boy D.S.

51.     The CNMC was aware or did not care that their failure to properly credential and require certification of the knowledge and skills of nurses and doctors at CNMC created a substantial and unnecessary risk of serious harm to the pregnant mothers and their babies who sought medical care at CNMC.


**Breaches of Duty by the Indian Health Service:**

52.     The Indian Health Service and its officers and employees breached the IHS's duty to supervise and audit the management and staff of the CNMC to ensure that the Indian Health Service's policies and procedures were complied with by the CNMC.

53.     The Indian Health Service and its managers were aware, or did not care, that the failure of the CNMC to implement policies and procedures consistent with the national standard of care for obstetric services created a substantial and unnecessary risk of serious injury or death to patients such as Alexis Stokes and Baby Boy D.S.

54.     The failure by the CNMC and the Indian Health Service to insure that the national standard of obstetric care was adopted and followed for labor and delivery was conduct by the Defendant in reckless disregard of the safety of all of its labor and delivery patients and their infant children.

55.     The failure by the CNMC and the Indian Health Service to adopt, implement, and ensure compliance with the appropriate national standard of obstetric care was unreasonable under the circumstances and created a high probability that their misconduct would cause serious harm to persons such as the Plaintiffs in this action.

**The CNMC Is an Accountability Free Zone:**

56.    Due to the application of the Federal Tort Claim Act, the CNMC, and its individual managers and employees, have no financial or other economic exposure to the consequences of routinely providing sub-standard medical care to its labor and delivery patients and their babies, including the Stokes family.

57.    For the reasons described in this Complaint and, in particular, the paragraph above, the CNMC, unlike all other private health care facilities, is an ***accountability free zone*** with respect to adverse patient outcomes resulting from ongoing failures to adopt, implement, and enforce compliance by the nursing and medical staff with the appropriate national standard of care involving labor and delivery.

**The Chickasaw Nation Secretary of Health and the CNMC Leadership have Failed to Establish a Culture of Safety Among the Management, the Medical Staff, the Nursing Staff and the Employees at the CNMC.**

58.    A  Culture of Safety at a hospital is critical in order to provide for an adequate level of patient safety.

59.    Dr. Judy Goforth Parker, the Chickasaw Nation Secretary of Health, has failed to establish, and cause to be maintained, a Culture of Safety at the CNMC.

60.    Facts supporting the failure of CNMC to establish a Culture of Safety include the failure to establish policies and procedures that conform to the national standard of care for obstetric care of patients at CNMC.

61.    Facts supporting the failure of CNMC to establish a Culture of Safety include the failure

to follow published Indian Health Service requirements with respect to the operation of the obstetric and pediatric services at the CNMC.

62.     Facts supporting the failure of CNMC to establish and maintain a Culture of Safety include the failure to routinely conduct patient medical chart reviews to ensure that the labor and delivery nurses consistently follow the written policies and procedures of the CNMC for the conduct of induction of labor.

63.     Facts supporting the failure of CNMC to establish a Culture of Safety include the fact that the CNMC allows multiple critical employees to sleep while on duty at their work stations even when their duties require their attention in order to monitor or respond to patients.

64.      Facts supporting the failure of CNMC to establish a Culture of Safety include the pictures below which demonstrate "on duty" nurses sleeping at their work stations at CNMC.



These two pictures were posted on the internet during the week of April 17, 2017, eleven months after Baby Boy D.S. was born.  On information and belief, these pictures were taken at one of the nursing central monitoring stations of the CNMC.  The person who took the pictures was, on information and belief, a patient's relative who was unable to contact the nurses' station either by the "call light" or by a phone call. For that reason, the patient's relative walked down to the nurses' station, whereupon she observed the CNMC staff asleep, while on duty, and took these damning pictures.

**Normalization of Deviancy:**

65.     A Culture of Safety cannot be established or maintained in the CNMC hospital when

there is a ***normalization of deviancy*** with respect to:

  a.  Nurses routinely failing to follow safety related Doctors' Orders;
  b.  Nurse Midwives routinely failing to follow safety related Doctors' Orders;
  c.  Nurses routinely failing to follow the safety related orders of Nurse Midwives;
  d.  Doctors failing to review fetal heart tracings prior to undertaking operative deliveries;
  e.  Doctors and Nurse Midwives failing to arrange for a pediatrician to attend a delivery for a baby whose fetal heart tracing is clearly a Category III fetal heart tracing.
  f.  Doctors and Nurse Midwives failing to remove obstacles and otherwise arrange for an urgent Caesarian section delivery in the presence of a Category III fetal heart tracing.
  g.  The management of the CNMC, repetitively failing to update policies and procedures on a regular basis, for years at a time, so that the policies and procedures comply with the Indian Health Service mandate that such policies and procedures conform to the current national standard of care as described by the American College of Obstetricians and Gynecologists;
  h.  The management of the CNMC failing to cause routine audits of patient medical charts to ensure that nurses, nurse midwives, and doctors are following even the antiquated obstetric policies and procedures of the CNMC;
  i.  The IHS routinely failing to audit the CNMC to ensure that the CNMC did in fact follow the IHS requirements that "… the highest possible technical level of obstetric care" is provided to [American Indians] … as determined by accepted national standards;"
  j.  The CNMC routinely failing to document, track, and report Sentinel Events and to adequately investigate such events in order to determine the root cause of such events;
  k.  Nurses sleeping when on duty at their central work stations.

66.     On information and belief, no nurse has been disciplined for any action associated with

the Sentinel Event on May 17, 2016, involving Baby Boy D.S.

67.     On information and belief, no nurse midwife has been disciplined for any action

associated with the Sentinel Event on May 17, 2016, involving Baby Boy D.S.

68.     On information and belief, no doctor has been disciplined for any action associated with

13

the Sentinel Event on May 17, 2016, involving Baby Boy D.S.

69.     On information and belief, no written policy at CNMC related to labor and delivery has been materially changed to conform to ACOG standards since the Sentinel Event on May 17, 2016, involving Baby Boy D.S.

**The Management of the Chickasaw Nation Medical Center**
**Has Failed the Governor and the People of the Chickasaw**
**Nation:**

70.     For the reasons described in paragraphs 13-69, above, the management and staff of the Chickasaw National Medical Center have wholly failed the Governor of the Chickasaw Nation and all of its tribal members and the Indian citizens of all tribes and their family members who use, or require the use of, the medical services at the CNMC hospital, as well as Baby Boy D.S.

**Facts Specific to Alexis Stokes, Taylor Stokes and their Son,**
**Baby Boy D.S.:**

71.     Plaintiff Alexis Stokes was a patient of the Chickasaw Nation Medical Center in Ada, Oklahoma, during 2015 and continuing through May 17th of 2016, for the care of herself and her unborn infant, now known as Baby Boy D.S.

72.     In May of 2016, Alexis Stokes was directed to present herself to the Chickasaw Nation Medical Center for induction of labor, for the delivery of her first child, a son, Baby Boy D.S.

73.     The nursing staff of the CNMC admitted Alexis Stokes for an elective induction of labor at 39 weeks of pregnancy on Sunday evening, May 15, 2016.

74.     This was Alexis Stokes' first pregnancy.

75.     The individuals identified as Tamara Daniel, Ashley Curtis, Dr. Frow, & Dr. Balogun

14

were, on the night of May 16 and morning of May 17, employees of the CNMC and covered, with respect to liability, by the Federal Tort Claim Act.

76.     Employees of the Chickasaw Nation Medical Center were responsible for monitoring Alexis Stokes and for the delivery of Baby Boy D.S.

77.     Alexis Stokes' cervix was not "ripe" at the time the CNMC staff began the process to induce the onset of labor.

78.     On May 15, 2016, the CNMC nursing staff determined that Alexis Stokes had a "Bishop's Score" of 5 (five).

79.     The medical literature reflects that patients such as Alexis Stokes who undergo induction of labor for a first pregnancy with a Bishop's score of 5 or less, have approximately a 50%, or higher, rate of caesarean section, rather than vaginal births.

80.     The medical records at CNMC do not reflect that Alexis Stokes was ever informed of this elevated risk of caesarian section associated with an elective induction for a first pregnancy for a mother with a cervix that is not "ripe."

81.     Alexis Stokes was not in fact informed of the increased risk of cesarean section due to the induction of labor with an un-ripe cervix in a mother delivering her first child.

82.     The only risk factor suggesting that induction of labor for Alexis Stokes was appropriate for her on May 15, 2016, was the fact that she had mild hypertension.

83.     Alexis Stokes' mild hypertension was stable and well controlled.

84.     On May 15, 2016, Alexis Stokes was approximately 39 weeks into her pregnancy and at term.

85.     On May 15, 2016 Alexis Stokes was not overdue or late with respect to the normal time

to deliver a baby.

86.     The staff at the CNMC was obligated to inform Alexis Stokes that, by agreeing to undergo an induction of labor with a low Bishop's score, she would run a 50% (or more) chance of a caesarian section.

87.     At the time Alexis Stokes' induction of labor began on Sunday May 15, 2016, the electronic fetal heart tracing for Baby Boy D.S. revealed that he was well oxygenated.

88.     At the time Alexis Stokes' induction of labor began on Sunday May 15, 2016, the electronic fetal heart tracing for Baby Boy D.S., and all other available data, indicated that Baby Boy D. S. was a perfectly healthy fetus at full term.

89.     At the time Alexis Stokes' induction of labor began on Sunday May 15, 2016, there was no data, or any other indication, that Baby Boy D.S. was in any way compromised.

90.     There is no data, or other information, that suggests that Baby Boy D.S.'s oxygen status was in any way compromised prior to the early morning hours of May 17, 2016.

91.     The electronic fetal heart monitoring consistently demonstrated that Baby Boy D.S. remained a well oxygenated baby until the early morning hours of May 17, 2016.

92.     From approximately 19:00 on the evening of May 16 until 03:17 on the morning of May 17, 2016, the labor of Alexis Stokes was managed exclusively by a bedside nurse and a Certified Nurse Midwife (CNM).

93.     CNM Ashley Curtis was the obstetric care provider for Alexis Stokes during the night of May 16 and the early morning hours of May 17, 2017.

94.     At that time, Ashley Curtis had been certified as a nurse midwife for a period of less than one year.

16

95.    At that time, Ashley Curtis did not have privileges to perform a vacuum extraction without supervision.

96.    At, or around midnight, May 16, 2016, Ashley Curtis, the CNM obstetric care provider for Alexis Stokes had been on duty for more than 12 hours.

97.    On information and belief, around midnight on May 16, 2016, Ashley Curtis, the obstetric care provider for Alexis Stokes, left the bedside in order to sleep or rest.

98.    Thereafter, until approximately 03:17 Tuesday morning, the care provided Alexis Stokes was exclusively provided by a bedside nurse, Tamara Daniel, R.N.

99.    Between midnight Monday night and 01:30 Tuesday morning, the fetal heart tracing deteriorated from a Category I fetal tracing to a Category II fetal tracing.

100.    At some time between 01:00 and 02:30 Tuesday morning, the fetal heart tracing deteriorated from a Category II fetal tracing to a Category III fetal tracing.

101.    At approximately 02:50, the bedside nurse, Tamara Daniel, "notified" the CNM of the condition of Alexis Stokes.

102.    After the notification by Nurse Daniel, at 02:50 Tuesday morning, there was a delay of 27 minutes before any Nurse Midwife arrived at bedside to help Alexis Stokes deliver her baby.

103.    After the notification by Nurse Daniel at 02:50 Tuesday morning, there was a delay of 27 minutes before any doctor responded and arrived at bedside to help Alexis Stokes deliver her baby.

104.    A delay of 27 minutes by an in-house obstetric caregiver in responding to the bedside of a mother with a Category III fetal heart tracing was, and is, a departure from the appropriate national standard of obstetric care.

17

105.    A delay of 27 minutes by an in-house obstetric caregiver in responding to the bedside of a mother with a Category III fetal heart tracing was a departure from the national standard of care that created a substantial and unnecessary risk that the delay would cause serious injury to Alexis Stokes and/or Baby Boy D.S.

106.    A delay of 27 minutes by an in-house obstetric caregiver in responding to the bedside of a mother with a Category III fetal heart tracing was a departure from the national standard of care that was unreasonable under the circumstances.

107.    A delay of 27 minutes by an in-house obstetric caregiver in responding to the bedside of a mother with a Category III fetal heart tracing was a departure from the national standard of care that, under the circumstances of this case, created a high probability of serious harm to Baby Boy D.S.

108.    At 03:17 on May 17, Dr. Frow (OBGYN) and the CNM arrived together at the bedside of Alexis Stokes.

109.    Baby Boy D.S. was born 26 minutes later, at 03:43 AM.

110.    From the time the CNM was "notified" until the time Baby Boy Stokes was born was 53 minutes.

111.    From early Monday morning, May 16 to 03:43 on Tuesday May 17, the electronic fetal heart tracing and associated uterine contraction data were consistently interpreted by the hospital's sophisticated computer based perinatal surveillance system.

112.    The data from the fetal heart monitor was routinely displayed and otherwise readily available for the bedside nurse, the CNM, and the OBGYN.

113.    That same data was also available to any person sitting at the remote central monitoring

station in the labor and delivery unit at the CNMC.

114.    In May of 2016, software and hardware technology was available in the medical device marketplace so that CNMC could have provided the nurse midwife and the OBGYN technology to enable the nurse midwife and the OBGYN to see and evaluate the current fetal heart tracing data using remote portable electronic devices, such as personal laptop computers, iPhones, tablets, and other similar electronic devices.

115.    The computer system supporting the electronic fetal monitor provided software generated evaluations of the data from the electronic fetal monitor system at regular fifteen minute intervals of every hour during the night of May 16th and through the time of the labor and delivery of Alexis Stokes.

116.    From 20:45 Monday night until 03:15 Tuesday morning, the electronic fetal monitor computer system generated and documented interpretations of the electronic fetal heart rate and the associated uterine contractions on approximately 27 discrete, consecutive, instances - - at 15 minute intervals.


**Oxytocin - - known by its trade name - - Pitocin:**

117.    Pitocin is the trade name of the drug Oxytocin and is used to induce uterine contractions for the purpose of assisting the progress of labor.

118.    Oxytocin (Pitocin) is a drug that is classified as one of the limited number of specific "high risk" medications by the Institute for Safe Medication Practices (ISMP).

119.    The "high risk" medication designation for Pitocin has been recognized in peer reviewed medical journals.

19

120.    Persistent uterine contractions that occur too frequently can cause fetal hypoxia.

121.    Persistent uterine contractions that have the resting pressure (tone) measured in the interval between the end of one contraction and the start of the next contraction that is higher than 25 mm/Hg can cause fetal hypoxia.

122.    Persistent uterine contractions that do not allow at least one minute of resting pressure (tone) at a value of less than 25mm/Hg during the interval between successive contractions can cause fetal hypoxia.

123.    When improperly used, Pitocin can cause uterine contractions to occur too frequently.

124.    When improperly used, Pitocin can cause the resting interval between the end of one contraction and the start of the next contraction to become shorter than one minute.

125.    When improperly used, Pitocin can cause the contraction resting tone (during the interval between successive contractions) to be elevated above 25 or 30 mm / Hg (millimeters of Mercury, as, for example, measured by an Intra Uterine Pressure Catheter, or IUPC.)

126.    Compliance with the national standard of care for administration of Pitocin requires the care provider to reduce the rate at which Pitocin is administered to the mother when the occurrence of a contraction resting uterine tone above 25 (national standard of care) or 30 (CNMC standard of care) mm/Hg is repeatedly observed during the interval after the completion of one contraction and before the beginning of the next successive contraction.

127.    Compliance with the national and CNMC standard of care requires the care provider to reduce the rate at which Pitocin is administered to the mother when the care provider observes the time interval between successive contractions to be less than 60 seconds (one minute) in duration.

20

128.    At approximately 21:15 Monday night, and according to the CNMC computer generated data, the resting interval between contractions was less than one minute (about 32 seconds) and nurse Tamara Daniel increased the rate of infusion of Pitocin from  6 mu/min  to 10 mu/min.

129.    At 21:15, increasing the Pitocin from 6 mu/min to 10 mu/min was a direct violation of the written Doctors' Orders and the nurse midwife's Orders in the medical records of Alexis Stokes which direct the nurse to decrease the Pitocin when the resting interval between contractions is less than one minute.

130.    At approximately 22:23 Monday night, and according to the CNMC computer generated data, the resting interval between contractions was less than one minute (between about 34 seconds to about 37 seconds).  The contraction resting tone between successive contractions was between 31 mmHg and 36 mmHg.  Nurse Tamara Daniel increased the rate of infusion of Pitocin from 10 mu/min to 14 mu/min.

131.    At 22:23, increasing the Pitocin from 10 mu/min to 14 mu/min was a direct violation of the written Doctors' Orders and the nurse midwife's Orders in the medical records of Alexis Stokes which direct the nurse to decrease the Pitocin when the resting interval between contractions is less than one minute and to decrease the Pitocin if the contraction resting tone is more than 30 mmHg.

132.    At approximately 23:19 Monday night, and according to the CNMC computer generated data, the resting interval between contractions was less than one minute (about 34 seconds to 38 seconds).  The contraction resting tone between successive contractions was between 37 mmHg and 39 mmHg.  At that time, Nurse Tamara Daniel documented in handwriting on the electronic fetal tracing that the rate of infusion of Pitocin was increased from 14 mu/min to 18 mu/min.

133.   At 23:19, increasing the Pitocin from 14 mu/min to 18 mu/min was a direct violation of the written Doctors' Orders and the nurse midwife's Orders in the medical records of Alexis Stokes which direct the nurse to decrease the Pitocin when the resting interval between contractions is less than one minute or the contraction resting tone is more than 30 mmHg.

134.   The increases in the rate of infusion described in the previous six paragraphs were made or documented by Nurse Daniel.

135.   When each of those increases in the rate of infusion of Pitocin was started, Nurse Daniel was aware, or did not care that she was violating the doctor's Orders in the chart of Alexis Stokes.

136.   Starting at 20:45 Monday night and continuing through 03:15 Tuesday morning (May 17, 2016), there were 27 discrete, consecutive occasions, at 15 minute intervals, for which the CNMC perinatal surveillance computer system generated patient information for the nurses and care providers which included (among other data) calculations: a) reporting the average frequency of contractions, [example: 5 in 10 minutes], b) the average length of uterine contractions [example: 88 seconds], and c) the average contraction resting tone (pressure) [example: 31 mmHg].

137.   At the time of each of those 27 discrete, consecutive 15 minute intervals, when the patient data was generated by the computer system interpreting the electronic data from the fetal monitoring system, the bedside nurse and the CNM obstetric provider  failed:

   a.   To comply with the national standard of care for management of Pitocin during labor and delivery on each and every one of those 27 consecutive 15 minute intervals; and,

   b.   To comply with the CNMC Doctors' Orders for management of Pitocin during labor and delivery on at least 24 of those 27 consecutive 15 minute intervals; and,

    c. To comply with the CNM's own Orders, which the nurses were obligated to follow, for the management of Pitocin during labor and delivery on at least 24 of those 27 consecutive 15 minute intervals.

138.    The cumulative effect of the two dozen sequential ongoing discrete failures of the bedside nurse (in a three hour and thirty minute period immediately before birth) to comply with the safety-critical Doctor's Orders, was unreasonable under any circumstances.

139.    The cumulative effect of the two dozen sequential ongoing discrete failures of the bedside nurse (in a three hour and thirty minute period immediately before birth) to comply with the safety-critical Doctor's Orders, created a high probability of serious harm to Baby Boy D.S.

140.    By 01:30 Monday morning, the explicit standing Doctor's Orders and the information available from a proper interpretation of the electronic fetal tracing, required the bedside nurse, Tamara Daniel,  to take the following actions:

    a. Discontinue the Pitocin;
    b. Administer Terbutaline to stop the contractions;
    c. Call the OB care provider to bedside STAT.

141.    At no time between midnight and the birth of Baby Boy D.S. did Tamara Daniel or any other provider discontinue the Pitocin or administer Terbutaline.

142.    The failure of Nurse Tamara Daniel to comply with the explicit written Doctor's Orders and to timely perform the three actions described in paragraph 140 above, was a direct violation of the standing Doctor's Orders in the medical records of Alexis Stokes.

143.    Nurse Tamara Daniel was aware, or did not care, that her failure to take the three actions described in paragraph 140, above, created an unnecessary risk of great harm or death for Baby Boy D.S.

144.    The failure of Nurse Tamara Daniel to timely perform the three actions described in paragraph 140, above, did cause great harm to Baby Boy D.S.

145.    At any time during the first two hours after midnight, Monday, if the bedside nurse had simply followed the national standard of obstetric care and discontinued the Pitocin, and taken the routine steps to provide maternal resuscitation for the mother and baby in utero, then, more likely than not, the crisis with respect to Baby Boy D.S.'s fetal hypoxia would have resolved and no subsequent emergency delivery would have been required.

146.    By 02:00 Tuesday morning, it was a breach of the national obstetric standard of care for Tamara Daniel not to have requested the doctor to be present at the bedside "STAT".

147.    By 02:00 on Tuesday morning, it was a breach of the national obstetric standard of care to fail to prepare for an emergency delivery, including assembly of the operating room team and the pediatric resuscitation team.

148.    A competent operative delivery in the next 30 minutes after 02:00 Tuesday morning, would, to a medical probability, have resulted in no fetal injury.

149.    After midnight, Tamara Daniel did not notify any care provider of any issue with Alexis Stokes' labor until 02:50 Tuesday morning.

150.    A reasonable evaluation of the electronic fetal heart tracing for Baby Boy D.S. is that, at 03:17 on May 17, 2016, Baby Boy D.S. had been suffering from various levels of hypoxia for more than one hour.

151.    The attending CNM and Dr. Frow conducted a vacuum assisted delivery of Baby Boy D.S. which began around 03:26 and lasted 17 minutes.

152.    In the presence of an unresolved Category III fetal heart tracing, a 17-minute-long

24

vacuum extractor assisted delivery, which included the unnecessary removal of the vacuum instrument to allow delivery by two subsequent natural maternal contractions, was a departure from the national standard of care.

153.    Dr. Frow documented, as part of his report of his "PROCEDURAL TECHNIQUE" that:

"The fetal heart tones were reassuring."

154.    The fetal heart tones had not been "reassuring" for more than an hour at the time Dr. Frow arrived at bedside at 03:17 on the morning of May 17, 2016.

155.    At 03:17, when Dr. Frow arrived at bedside, the fetal heart tracing was a "Category III" fetal heart tracing as defined by the national standard of obstetric care.

156.    A "Category III" fetal heart tracing, as defined by the American College of Obstetricians and Gynecologists, is not a "reassuring" fetal heart tracing, as the term "reassuring" was used by Dr. Frow in his written record of the delivery of Alexis Stokes.

157.    A Category II fetal heart tracing is not a "reassuring" fetal heart racing.

158.    Only a Category I fetal heart tracing is considered to be "reassuring" (as that term was used by Dr. Frow) of the fetal status.

159.    A "Category III" fetal heart tracing requires emergency intervention by a qualified obstetrician or to resuscitate the fetus "in utero" and/or accomplish an immediate delivery.

160.    At 03:17 on May 17, 2016, the fetal tracing had been a "Category III" fetal heart tracing for over one hour.

161.    The attending obstetrician had a duty to reasonably evaluate the electronic fetal heart tracing at 03:17 on Thursday, May 17, 2016.

162.    Dr. Frow failed to reasonably evaluate the fetal heart tracing prior to conducting the

delivery by vacuum extraction of Baby Boy D.S.

163.     If Dr. Frow failed to actually evaluate the fetal heart tracing, then Dr. Frow was derelict in his duty to his patient.

164.     Alternatively, if Dr. Frow did evaluate the fetal heart tracing prior to conducting the operative delivery by vacuum extraction and failed to recognize that the fetal heart tracing was not a "reassuring" fetal heart tracing, then Dr. Frow was incompetent as an obstetrician.

165.     During the two minute period immediately before Dr. Frow arrived at bedside, the fetal heart tracing demonstrated a fetal heart rate deceleration from more than 170 beats per minute down to less than 80 beats per minute.

166.     During the five minute period of time after the fetal heart strip notation states that Dr. Frow was at bedside (03:17), the fetal heart rate increased to more than 190 beats per minute and then again decelerated to a rate of less than 90 beats per minute.

167.     The vacuum extraction delivery lasted approximately 18 minutes.

168.     The vacuum extraction delivery was not conducted in an urgent manner.

169.     The vacuum extraction delivery, as conducted by Dr. Frow, was a procedure that did not comply with the standard of care, due to the severity and length of the ongoing hypoxia being experienced by Baby Boy D. S. before and during the delivery.

170.     Prior to the vacuum extraction by Dr. Frow, Baby Boy D.S. had a fetal heart rate of more than 170 beats per minute.

171.     At 03:43 AM, when Baby Boy D.S. was born, he had a heart rate of 42 BPM.  He had no tone.  He had no respirations, was unable to breathe on his own and had an "Apgar Score" of "1" (out of 10).

172.    During the one hour period before 03:17, no person at CNMC alerted the nursery or pediatric staff of the Category III status of the fetal heart tracing.

173.    At the time of the onset of the Category III fetal heart tracing, the CNMC nurses, staff, and obstetrician were required to immediately take all steps necessary to remove any obstacles to a subsequent decision to perform an emergency surgical delivery by caesarian section.

174.    The level of culpability associated with the failure to timely remove any obstacles to an emergency caesarian delivery (described in the previous paragraph) is greatly enhanced by the failure of the nursing and medical staff to recognize that the induction of labor with a first pregnancy and an un-ripe cervix created a statistical likelihood greater than 50% that Alexis Stokes would require a caesarian section delivery.

175.    Prior to his birth at 03:43, no person at CNMC ever asked that an operating room be made ready for an emergency caesarean section for Alexis Stokes.

176.    No operating room was ever prepared for an emergency caesarean section for Alexis Stokes.

177.    The onset of a Category III fetal heart tracing required that CNMC nurses, staff, and pediatrician make preparation before birth to provide for an immediate resuscitation of Baby Boy D.S. after his birth.

178.    There was objective evidence in the fetal heart tracing during the one hour period prior to his birth that Baby Boy D.S. would likely require at least some resuscitation after birth.

179.    Prior to his birth at 03:43, no person at CNMC requested a pediatrician to be available at bedside for the birth of Baby Boy D.S.

180.    There was no pediatrician present at bedside when Baby Boy D.S. was born.

181.    No pediatrician arrived and assumed the care of Baby Boy D.S. until more than 27 minutes after Baby Boy D.S. was born.

182.    Baby Boy D.S. was not intubated with any endotracheal tube (ET tube) to assist his breathing until 04:01, approximately 18 minutes after he was born.

183.    Baby Boy D.S. was not intubated with a correctly sized (4mm) endotracheal tube until approximately 04:10, a period of approximately 27 minutes after he was born.

184.    At the time Baby Boy D.S. was born, the emergency equipment "tray" with equipment for accomplishing a newborn resuscitation was missing one or more items of routine equipment normally used to assist in the resuscitation of newborn babies.

185.    At the time of delivery, there was no readily available "stylet", which is an inexpensive disposable device used to assist in the prompt and accurate placement of an endotracheal breathing tube during an emergency resuscitation.

186.    Dr. Balogun, the pediatrician who did arrive at the nursery at some time after Baby Boy D.S. was intubated, is not board certified in pediatrics.

187.    On the morning of May 17, 2016, Dr. Balogun was an employee of the CNMC, covered within the scope of the Federal Tort Claim Act.

188.    Around 04:30 on the morning of May 17, 2016, Dr. Balogun requested an ambulance be dispatched from OU Children's hospital to transport Baby Boy D.S. to Oklahoma City.

189.    Approximately two hours later, and while the requested emergency ambulance was en route and traveling from Oklahoma City to Ada, Dr. Balogun caused the ambulance transfer to be canceled, and the ambulance to return to Oklahoma City.

190.    At the time the emergency ambulance transfer was canceled by Dr. Balogun, the parents

of Baby Boy D.S. had not yet been informed that their son was suffering from the effects of perinatal hypoxia.

191.    At the time the emergency ambulance transfer was canceled by CNMC, the parents had not been informed that their son urgently required transfer to OU Children's hospital in order to take advantage of an available procedure to "cool" Baby Boy D.S.'s brain and to thereby mitigate, in part, the inevitable adverse effects on his brain of his perinatal hypoxia.

192.    The failure to timely inform Alexis and Taylor Stokes of the condition of their son was a breach of the standard of care.

193.    The cancellation of the emergency ambulance transfer of Baby Boy D.S. to OU Children's hospital by the pediatrician at the CNMC, without consulting the parents, was a gross breach of medical ethics.

194.     The cancellation of the emergency ambulance transfer of Baby Boy D.S. to OU Children's hospital by pediatrician Balogun at the CNMC, without consulting the parents, was a departure from the standard of care.

195.    The cancellation of the emergency ambulance transfer of Baby Boy D.S. to OU Children's hospital by pediatrician Balogun at the CNMC, without consulting the parents, was conduct of the Defendant that was, or amounted to, a reckless disregard for the rights of others.

196.    The cancellation of the emergency ambulance transfer of Baby Boy D.S. to OU Children's hospital by the pediatrician at the CNMC, without consulting the parents, was conduct of the Defendant that was, or amounted to, willful misconduct.

197.    The cancellation of the emergency ambulance transfer of Baby Boy D.S. to OU Children's hospital by the pediatrician at the CNMC, without consulting the parents, was

conduct of the Defendant that was, or amounted to, an intentional or malicious departure from the standard of care.

198.    Dr. Balogun expected the result of the cancellation of the emergency transfer of Baby Boy D.S. to result in the death of Baby Boy D.S. while he remained at the CNMC hospital facility.

199.    There was a high probability that the cancellation of the emergency transfer of Baby Boy D.S. to OU Children's hospital at around 04:30 on Tuesday morning would result in the death of Baby Boy D.S. while he remained at the CNMC hospital facility.

200.    Had Baby Boy D.S. died while at the CNMC hospital facility, the CNMC hospital facility would have avoided the financial obligation to make substantial payments to OU Children's Hospital for the care of Baby Boy D.S.

201.    The cancellation of the emergency ambulance transfer of Baby Boy D.S. to OU Children's hospital by pediatrician Balogun at the CNMC, without consulting the parents, was a deliberate and consequential departure from the standard of care that Dr. Balogun expected would result in the imminent death of Baby Boy D.S. while he remained at the CNMC facility.

202.    There is a medical procedure available at OU Children's Hospital that cools the body and brain of an infant child for approximately 72 hours and the purpose of that procedure is to mitigate damage from previous hypoxia suffered by the infant.

203.    In order to obtain the most effective results from the body & brain cooling protocol, the protocol must be implemented promptly after the hypoxic insult, and generally within a window of approximately 6 hours after the hypoxic insult.

204.    Sometime after 06:30 on Thursday, May 17, and approximately 3 hours after the birth of

Baby Boy D.S., Alexis Stokes and Taylor Stokes were first informed of their son's life-threatening condition.

205.    When Alexis Stokes and Taylor Stokes were informed of their son's life-threatening condition, they asked that their son be emergently transferred to OU Children's Hospital where he could obtain the benefit of the time critical brain cooling procedure available at that hospital.

206.    At the time of the parental request for the urgent transfer (approximately 07:00 on Tuesday, May 17), the specially equipped ambulance that had previously been dispatched around 04:30, and which had earlier been en route from Oklahoma City to Ada, had already been turned around and had just arrived back in Oklahoma City.

207.    At or shortly after that same time, Dr. Balogun then (for a second time) called to Oklahoma City and requested that the ambulance be turned around and re-dispatched from Oklahoma City to Ada.

208.    The consequence of that series of actions by Dr. Balogun was that the ambulance did not arrive in Oklahoma City with Baby Boy D.S. until more than nine (9) hours after he was born.

209.    The procedure to use whole body hypothermia to cool a baby for 72 hours in order to protect the baby's brain is a time critical procedure whose purpose is to mitigate or minimize damage to a baby's brain after an hypoxic ischemic event.

210.    Baby Boy D.S. was diagnosed by OU Children's hospital as suffering from hypoxic ischemic encephalopathy (HIE).

211.    This condition (HIE) results from a lack of oxygen to the brain of a fetus and/or a new-born child.

212.    In the two hour period prior to his birth, Baby Boy D.S.' fetal reserves were reduced as a

result of excessive uterine contraction activity.

213.    The hypoxia or anoxia or combination of hypoxia and anoxia that caused Baby Boy D.S.'

HIE occurred at or around the time of his birth.

214.    The only cause of Baby Boy D.S.' current condition is the hypoxic ischemic

encephalopathy he suffered at or about the time of his birth at the CNMC hospital.

215.    Alexis and Taylor Stokes were advised by the treating physicians at OU Children's

hospital that their son would likely suffer from spastic quadriplegia, commonly known in lay

terms as cerebral palsy.

216.    Alexis and Taylor Stokes were advised by the treating physicians at OU Children's

hospital that their son would likely require life-long, full-time care.

217.    The treating physical therapist providing weekly care for Baby Boy D.S. has treated other

children born at the CNMC and its predecessor hospital with the same or similar condition as

Baby Boy D.S.

218.    The treating physical therapist providing weekly care for Baby Boy D.S. has stated in

writing his opinion that Baby Boy D.S. will, with continued good care, likely survive and live

well into his adult years.

219.    The parents of Baby Boy D.S. are providing excellent care for their child.


**Failure to Provide Medical Records Relevant to the Care of**
**Alexis Stokes and Baby Boy D.S.:**

220.    In July of 2016, Taylor Stokes, father of Baby Boy D.S., made a personal trip to the

CNMC where he filled out the necessary forms and made a formal written request for all of the

32

relevant medical records relating to his son and his wife Alexis Stokes, including the entire fetal heart monitoring tracing.

221.    When those records were finally produced to Taylor Stokes by CNMC, a number of critical records that one normally finds in a medical chart were not present, including:

    a.  Nurses notes;
    b.  Doctors notes and dictation relating to the emergency delivery at 03:43AM on May 17th;
    c.  Multiple pages were missing from the electronic fetal monitor tracing.

222.    On October 12, 2016, a second request for medical records was hand-delivered to the CNMC records clerk by counsel for the Stokes' family.   Two weeks later, a 2nd set of medical records was produced to counsel for the Stokes' family.

223.    The 2nd set of records was substantially more complete than the first set of records.

224.    The 2nd set of records was, however, also incomplete, and remains so as of the time this Complaint is filed.

225.    The failure to timely provide complete medical records is a violation of the Federal Health Insurance Portability and Accountability Act of 1996 (**HIPAA**), Public Law 104-191 and, *The Health Information Technology for Economic and Clinical Health* (**HITECH**) Act, as implemented by 45 CFR § 164.

226.    The Chickasaw Nation, through its Attorney, Carolyn Romberg, has represented to the probate Court in Pontotoc County, Oklahoma, that the Chickasaw Nation has "sequestered" all of the documents requested by Counsel for the Ward, in a letter delivered to the CNMC on October 12 of 2016.    Substantial portions of that request for records pertinent to the care of Baby Boy D.S. were not, and have not, been produced.

227.    On March 27, 2017, subsequent counsel for the Chickasaw nation advised the probate

Court in Pontotoc County Case number PGM-16-45 (Guardianship for Baby Boy D.S.)  that:

> "Mr. Braly's request to sequester documents has been honored and will continue
> to be honored; the documents previously by letter and those documents requested
> and previously described in the Subpoena issued by the Court have been
> sequestered and everything is being preserved so that they might later be
> produced as part of an anticipated action under the Federal Tort Claims Act; that
> nothing is going to happen to the records intentionally; "

**Other Breaches of the Standard of Care Involving
Institutional Negligence:**

228.    CNMC maintains an obstetric and pediatric service that, by its conception, design,

practice, staffing, and implementation, inherently delivers obstetric and pediatric services that do

not meet the appropriate national standards of care for doctors and nurses.

229.    On information and belief, one or more of the administrative or management employees

and/or agents of CNMC were responsible for all, or substantial portions, of the ongoing and

inherently substandard obstetric services provided at Chickasaw Nation Medical Center.

230.    The Defendant CNMC and the managers and administrative personnel of the CNMC

failed to adopt and implement adequate institutional procedures and standards to insure that

proper nursing and medical care would be provided to patients like Alexis and Baby Boy D.S. at

CNMC.

231.    On information and belief, in the three year period prior to May 17, 2016, there had been

no systematic review of medical record charts of patients for which Tamara Daniel had provided

bedside care during inductions of labor, to determine if Tamara Daniel was following the Orders

given to her by the medical and nurse midwife care providers with respect to the administration

34

of Pitocin.

232.   On information and belief, the bedside nurse, Tamara Daniel was not certified in electronic fetal monitoring (C-EFM) as of May 17, 2016.

233.   On information and belief, Ashley Curtis, the CNM, was not certified in electronic fetal monitoring (C-EFM) as of May 17, 2016.

234.   On information and belief, no person present at the time of birth of Baby Boy D.S. was then currently certified by the American Academy of Pediatrics in its Neonatal Resuscitation Program (NRP).

235.   Various individuals who assumed the responsibility for providing perinatal care for Alexis Stokes and Baby Boy D.S., were not properly credentialed to provide the care they attempted to provide to Alexis Stokes and Baby Boy D.S.

236.   Various individuals who assumed the responsibility for providing perinatal care for Alexis Stokes and Baby Boy D.S., were not properly certified to provide the care they attempted to provide to Alexis Stokes and Baby Boy D.S.

237.   The Joint Commission is the national organization which provides "accreditation" for hospitals in the United States.   The Joint Commission was formerly known as the   Joint Commission on Accreditation of Healthcare Organizations (JCAHO)

238.   The CNMC is a hospital which subscribes to The Joint Commission's accreditation services.

239.   The Joint Commission requires hospitals to track serious adverse outcomes involving, among other matters, events such as those surrounding the birth of Baby Boy D.S.

240.   Those types of events are identified as "Sentinel Events" by The Joint Commission.

241.    On information and belief, the Defendant CNMC, and the managers and administrative personnel of the CNMC (and its predecessor), failed to put in place proper procedures to identify, investigate, memorialize, document, and track Sentinel Events arising from labor and delivery and neonatal care at CNMC.

242.    On information and belief, the Defendant CNMC, and the managers and administrative personnel of the CNMC (and its predecessor), failed to put in place proper procedures to identify, investigate,  memorialize, and document the root cause analysis and the reasons for the occurrence of adverse Sentinel Events at the CNMC (and its predecessor).

243.    On information and belief, the Defendant CNMC failed to properly investigate the Sentinel Event associated with the birth of Baby Boy D.S..

244.    On information and belief, the Defendant CNMC failed to properly take, and preserve, statements from the health care providers involved in the Sentinel Event associated with the birth of Baby Boy D.S..

245.    On information and belief, the failure of CNMC to comply with its obligation to properly take, and preserve, contemporaneous statements from the health care providers and to preserve information pertinent to the Sentinel Event associated with the Birth of Baby Boy D.S. amounted to a spoliation of evidence.

246.    On information and belief, the Defendant CNMC and the managers and administrative personnel of the CNMC (and its predecessor) failed to take appropriate corrective actions in response to any determination of the cause or the root cause of previous Sentinel Events involving labor and delivery at the CNMC or its predecessor facility known as the Carl Albert Indian Hospital.

36

247.    On information and belief, the Defendant CNMC, and the managers and administrative personnel of the CNMC, failed to document and memorialize the corrective actions taken to eliminate the root causes of the previous Sentinel Events occurring in connection with perinatal care and labor and deliveries at the CNMC and its predecessor hospital.

248.    On information and belief, as of the time this Complaint is filed, the CNMC, and the managers and administrative personnel of the CNMC, have failed to document the corrective actions, if any, taken to address the root cause of the Sentinel Event associated with the labor and delivery of Baby Boy D.S. on May 17, 2016.

249.    On information and belief, the Defendant CNMC and the managers and administrative personnel of the CNMC, failed to put in place, and comply with, proper written policies, protocols, checklists and other procedures to eliminate or mitigate the causes of previous similar perinatal Sentinel Events at CNMC and its predecessor hospital.

250.    On information and belief, the Defendant CNMC was aware, or did not care, that the failure to determine the root cause or causes of previous perinatal Sentinel Events at CNMC (and its predecessor) was conduct that created a substantial and unnecessary risk of serious injury to persons such as Baby Boy D.S.


**Lack of Informed Consent:**

251.    The Defendant CNMC failed to properly and adequately inform Alexis Stokes of the elevated risk of a caesarian section if she was induced for labor and delivery with an unripe cervix.

252.    The Defendant CNMC failed to document in the medical records of Alexis Stokes that

the CNMC employees had properly and adequately informed Alexis Stokes of the elevated risk of a caesarian section if she was induced for labor and delivery with an unripe cervix.

253.    On information and belief, the Defendant CNMC failed to inform Alexis Stokes that some of the nurses who would attend to her during labor were not certified as competent (designated as "C-EFM") to read and interpret fetal monitor tracings.

254.    On information and belief, the Defendant CNMC failed to inform Alexis Stokes that staff members who would attend the delivery of her son were not certified to the NRP national standard for neonatal resuscitation.

255.    The Defendant CNMC, its managers, administrative personnel, medical staff, and nursing staff, failed to properly and adequately inform Alexis Stokes and Taylor Stokes of the risks to Alexis and her baby of the ongoing failure of CNMC to consistently implement appropriate policies, protocols, checklists, training, and periodic testing to validate the existence and maintenance of the required skills of competent nursing staff members at CNMC.

256.    The failure to inform Alexis and Taylor Stokes of the CNMC's institutional failure to comply with routine Joint Commission accreditation requirements was a failure to obtain informed consent from Alexis Stokes and Taylor Stokes of the risks of allowing the CNMC to conduct the perinatal care, labor & delivery of Alexis Stokes and her son Baby Boy D.S.

257.    The failure to inform Alexis and Taylor Stokes of the institutional failure of the management of the CNMC to adopt policies and procedures that comply with the published mandates of the Indian Health Service deprived Alexis and Taylor Stokes of their legal right to be informed of, and give consent to, the elevated risks of having their baby born at the CNMC hospital.

38

258.    Taylor and Alexis Stokes had the means and ability to arrange to have their baby at a high quality hospital facility.

259.    Had Taylor and Alexis Stokes known of the lack of compliance by the CNMC with the routine standards and requirements related to quality obstetric care that are detailed in this section dealing with lack of informed consent,  Taylor and Alexis Stokes would have elected to have their baby at a quality care facility.


**Damages:**

260.    Baby Boy D.S. has lost the ability to generate a lifetime of earnings from productive work.

261.    The ability of Alexis Stokes to continue her career and to continue to generate income and to accumulate benefits and retirement and other assets normally associated with gainful employment has been lost due to the catastrophic injuries suffered by her son Baby Boy D.S., which requires her to actively attend to his care 24 / 7.

262.    The parents of Baby Boy D.S., Alexis Stokes and Taylor Stokes have suffered, and will continue to suffer, enormous expense related to the extraordinary and wide range of optimal care required for their child as a consequence of their child's brain damage on May 17, 2016 at CNMC.

263.    Alexis Stokes and Taylor Stokes have each lost the ability to enjoy a normal life.

264.    Each parent and Baby Boy D.S. have lost their natural mutual and individual consortium with the other members of the family.

265.    Each parent has lost a lifetime of normal enjoyment of raising their firstborn child as a

normal, healthy, laughing, cheerful, loving, and energetic child.

266.    Baby Boy D.S. has lost the ability to reasonably enjoy any aspect of a normal life.

267.    Baby Boy D.S. has lost the ability to have a normal parent – child relationship.


**The Evidence of Medical Negligence is Clear and Convincing:**

268.    The evidence of ongoing, repetitive departures from the minimum standard of care, for several consecutive hours, which caused the permanent brain injuries to Baby Boy D.S. is clear and convincing.

269.    The prolonged (more than three hours), multiple, substantial, material, and dangerous departures from the appropriate standard of obstetric and neonatal care which caused the permanent brain injuries to Baby Boy D.S. is conduct that meets or exceeds the threshold so as to qualify as unreasonable conduct, under the circumstances, with an associated high probability of causing harm to Baby Boy D.S.

270.    The evidence that CNMC deliberately cancelled the original emergency ambulance transfer of Baby Boy D.S. to OU Children's Hospital is not only clear and convincing, but fully documented in the recorded words of Dr. Balogun, and is beyond any factual dispute.


**The Evidence of Medical Negligence Meets or Exceeds the Requirements of Oklahoma Law to Award Non-Economic Damages in Excess of $350,000.**

271.    The negligent, careless, reckless, and deliberate departures from the CNMC's written standard of care, described in this Complaint, created a substantial and unnecessary risk that such

conduct would cause serious injury and, in fact, near death, to the Plaintiffs' first born son.

272.    The negligent, careless, reckless, and deliberate departures from the CNMC's written standard of care, described in this Complaint, was unreasonable under the circumstances.

273.    The departures from the standards of care described in this Complaint created a high probability that the conduct would cause serious harm, death, or near death to Baby Boy D.S.

274.    Pursuant to 23 OS § 61.2, the limit or cap on noneconomic damages contained within that statute does not apply because Baby Boy D.S.'s medical and nursing care providers and the individuals managing the policies and procedures at the CNMC were aware or did not care that there was a substantial and unnecessary risk that their individual and collective misconduct would cause serious injury to patients like Alexis Stokes and Baby Boy D.S.  Such conduct was unreasonable under the circumstances and there was a high probability that the conduct would cause serious harm to the Plaintiffs.

**Lost Chance of Recovery or Survival:**

275.    In medical malpractice cases, Oklahoma recognizes the award of damages because of a lost chance of recovery from a condition being treated and a lost chance of survival.

276.    Baby Boy D.S. suffered a lost chance of a full recovery and a normal life expectancy from his ongoing, hypoxia in utero and in the period shortly after birth, by the earlier acts of the bedside nurse in failing to turn down and then later, her failure to completely discontinue the Pitocin.

277.    Baby Boy D.S. suffered a lost chance of a full recovery and a normal life expectancy from his ongoing hypoxia by the acts of the pediatric care givers in failing to provide adequate

ventilation and Oxygen for more than 18 minutes after he was born.

278.    Baby Boy D.S. suffered a lost or reduced chance of improved recovery from his perinatal hypoxic ischemic encephalopathy due to the deliberate cancellation by the CNMC pediatrician of emergency ambulance transfer to provide urgently needed cooling of his brain in the first six hours after his birth.

**Oklahoma Law Imposing Limits on Non-Economic Damages in Cases Involving Catastrophic Lifetime Injuries Is Unconstitutional Under Both State and Federal Law.**

279.    Oklahoma law does not impose caps or limitation on damages in death cases, but purports to impose caps or limitations on non-economic damages in cases involving catastrophic injuries without regard to the individual or unique circumstances and degree of consequential injury suffered.

280.    The Oklahoma law seeking to impose limitations on non-economic damages, as applied to the facts of this case involving Baby Boy D.S., are unconstitutional under both the Constitution of the State of Oklahoma and the United States Constitution, as Amended.

281.    In Federal Tort Claim Actions, in cases involving perinatal asphyxia injuries similar to those of Baby Boy D.S., United States Federal District Courts have awarded substantial amounts for non-economic damages to those children, and further substantial non-economic damages to the parents of those children.

282.    In Federal Tort Claim Act litigation, examples of such substantial non-economic damages, as described in the previous paragraph, and that ***have been judicially determined by a***

*federal judge to be reasonable* include the following in the year indicated:

      a.  2017 -  $7,625,000 to the child; (Judge Robert N. Scola, Jr.)
      b.  2017 -  $3,300,000 to the mother; (Judge Robert N. Scola, Jr.)
      c.  2013 -  $11,000,000 to the child;  (Judge David R. Herndon)
      d.  2010 -  $5,000,000 to the mother; (Jose A. Gonzalez, Jr.)
      e.  2010 -  $5,000,000 to the father; (Jose A. Gonzalez, Jr.)
      f.  2010 -  $9,100,000 to the child; (Jose A. Gonzalez, Jr.)
      g.  2000 -  $5,000,000 to the child;  (Judge H.F. Garcia)
      h.  2000 -  $5,000,000 to the mother;  (Judge H.F. Garcia)
      i.  2000 -  $5,000,000 to the father;  (Judge H.F. Garcia)

**The United States of America Seeks To Impose a Reversionary Trust For Any Damage Award for Future Care For Baby Boy D.S.**

283.    In Federal Tort Claim Act litigation, the Defendant, U.S.A., routinely asks the Court to place any award for future life care costs for a child (with injuries similar to those of Baby Boy D.S.) in a trust and then the U.S.A. further asks the Court to vest the U.S.A. with a reversionary interest in the remaining trust corpus at the time of the death of the child.

284.    On information and belief, in the event the Plaintiffs prevail in this case, the Defendant U.S.A. will ask the Court to impose such a trust and an associated reversionary interest in favor of the U.S.A.

285.    Standard U.S. government life expectancy tables state that the normal additional life expectancy for an otherwise healthy 11 month old male child, in May of 2017, is more than 82 years.

286.    Only in the event that the Court provides for future care sufficient in amount to provide adequate care for a normal 82 year long life expectancy for Baby Boy D.S. will it be legally

appropriate to impose a reversionary interest in any trust for the benefit of Baby Boy D.S.

**Parents' Lifetime Obligation of Support:**

*287.*     Under Oklahoma law,  which is different from many states, the parents of Baby Boy D.S. are financially responsible for the care of Baby Boy D.S. *for his entire life, including the portion of his life after he is 18 years of age or older.*

288.     Because of the relatively unusual feature of Oklahoma law that imposes liability on the parents of Baby Boy D.S. for his lifetime care (as opposed to care up to the age of 18), Plaintiffs' counsel is obligated to assert, in the Prayer for Relief below, a claim for each Plaintiff for the entire monetary damages associated with the lifetime care of Baby Boy D.S., but acknowledges that such claims are overlapping and subject to clarification by the ultimate Order of this Honorable Court.

## CLAIMS FOR RELIEF

289.     At this early stage in this lawsuit, it is impossible to itemize all elements of damages that may properly apply to this case.

290.     Each of the following designated Claims For Relief are intended to describe the broadest range and scope of the legally available categories of damages allowed by law, and to put the Defendant on notice of all such possible claims and related considerations, including, but not limited to the following:

    A. Great physical and mental pain and suffering;
    B. Agony and mental pain and emotional suffering;

C. Disfigurement;

D. Loss of enjoyment of life;

E. Self-enforced isolation of the family from friends, relatives, & society due to the condition of their son;

F. Loss of love and companionship;

G. Loss of consortium;

H. Loss of earnings and opportunities for earnings and the accumulation of related assets and benefits;

I. Medical, rehabilitative, and life care expenses, including but not limited to:

    a. Complex case management services;

    b. Cognitive deficits;

    c. Speech and Language disabilities;

    d. Developmental and growth delays

    e. Swallowing and feeding disorders;

    f. Asthma, reactive airway disease, and lung compromise;

    g. Occupational and physical therapy;

    h. Vocational rehabilitations;

    i. Recurrent illnesses and hospitalizations;

    j. Renal and cardiac care;

    k. Medication management;

    l. Pain management;

    m. Skin integrity management;

    n. Orthopedic surgery and management;

    o. Assistive medical devices;

    p. Assistance with all activities of daily living, including personal care and hygiene, elimination of bodily waste fluids and fecal matter, transportation, and household management;

    q. Handicapped housing and transportation;

    r. Loss of income and asset accumulation from wages, salaries, & benefits.

s.  Loss of insurability;

t.  Expenses associated with management of complex governmental regulatory, tax, and accounting obligations;

u.  Other economic and noneconomic losses the exact amount to be determined at trial.

## PRELIMINARY CLAIM FOR RELIEF

291.   The clear and convincing evidence of causal negligence and catastrophic lifetime brain injury in this action is so overwhelming, the Court, as a matter of efficient case management, should Order the parties to an early judicial mediation to attempt to settle this matter, preferably prior to the time of the required Rule 26(f) meeting of counsel.   In a show of good faith, counsel for the Plaintiffs is prepared to share with the Assistant U.S.A. preliminary reports of Plaintiffs' key experts and to arrange for the Assistant U.S.A. to conduct a telephone interview of those experts prior to the suggested Court Ordered Judicial Mediation.   This offer by Plaintiffs' counsel is extended on the assumption that the United States of America would participate in such mediation in good faith, with officials participating who are empowered to commit to a complete settlement of this matter at the time of the mediation.

## FIRST CLAIM FOR RELIEF

292.   Alexis Stokes incorporates by reference each of the previous paragraphs and makes claims for all injuries and damages recoverable in law and equity, including, without limitation, loss of consortium, and loss of enjoyment of life, loss of income, pain, and suffering sustained as a result of the negligence of the Defendant which is described in this Complaint.

46

## SECOND CLAIM FOR RELIEF

293.    Taylor Stokes incorporates by reference each of the previous paragraphs and makes claims for all injuries and damages recoverable in law and equity, including, without limitation, loss of consortium and loss of enjoyment of life, loss of income, pain, and suffering sustained as a result of the negligence of the Defendant, which is described in this Complaint.

## THIRD  CLAIM FOR RELIEF

294.   Alexis Stokes and Taylor Stokes incorporate by reference each of the previous paragraphs and each make claims on behalf of their son Baby Boy D.S. for all injuries and damages recoverable in law and equity, including, without limitation, loss of consortium, loss of enjoyment of life and loss of capacity for enjoyment of life, loss of income, pain and suffering sustained by their son as a result of the negligence of the Defendant which is described in this Complaint.

## PRAYER FOR RELIEF

295.   **WHEREFORE**, Plaintiffs Alexis Stokes and Taylor Stokes each ask for monetary damages as stated in the amended F.T.C.A Form 95 which is $115,000,000.00, plus costs, interest, attorney fees, and any other relief to which each Parent is entitled to receive by law or equity.

296.    Further, Alexis Stokes and Taylor Stokes, on behalf of their child, Baby Boy D.S., ask for monetary damages as stated in the amended F.T.C.A Form 95 which is $115,000,000.00, plus costs, interest, attorney fees, and any other relief to which Baby Boy D.S. is entitled to receive by

law or equity.

Respectfully submitted this  19th  day of May, 2017.

s / George W. Braly_____
George W. Braly   OBA # 1056
Braly, Braly, Speed, & Morris
201 West 14th
P.O. Box 2739
Ada, Oklahoma 74820-2739
(580) 436-0871
gwbraly@gami.com
Secondary: TaniaMonjaraz@bbsmlaw.com
*ATTORNEY TO BE NOTICED*

s / William W. Speed_____
William W Speed   OBA # 19031
Braly, Braly, Speed & Morris
201 West 14th
P.O. Box 2739
Ada, Oklahoma 74820-2739
(580) 436-0871
wspeed@cableone.net
*ATTORNEY TO BE NOTICED*

s / Lawrence R. Murphy, Jr._____
Lawrence R. Murphy, Jr. OBA # 17681
Richards & Connor, PLLP
525 S Main St.
12th Floor
Tulsa, Ok 74103
918-585-2394
918-585-1449(fax)
lmurphy@richardsconnor.com
*ATTORNEY TO BE NOTICED*

Attorneys for Plaintiffs Alexis &
Taylor Stokes and Baby Boy D.S.

Attorney Lien Claimed

48